FRANK D'AMICO, PETITIONER, v. MIDDLESEX DRESS COR-
PORATION AND NEW JERSEY MANUFACTURER'S
CASUALTY INSURANCE CO., A CORPORATION, RE-
SPONDENT.

Decided April 1, 1942.

For the petitioner, *David Roskein.*

For the respondent, *George E. Meredith* (by *Walter A.
Hubley*).

\*         \*         \*         \*         \*         \*         \*

The decedent, Mary D'Amico, was in the employ of the
respondent for about three years prior to June 5th, 1939.
During this time, it appears that although she occasionally
lost time from work, she nevertheless satisfactorily performed
the usual tasks required of her employment. In addition to
that work during the day time, the decedent also performed
the usual family household tasks as wife and mother. How-
ever, she was not altogether free from physical infirmity and
the testimony indicates that the decedent had been under the
care of one Dr. Joseph Schenk from time to time on and after
1931. The occasions for medical treatment were not frequent
and were rendered for various conditions, none of which bear
relationship to this case, except one. During the many years
as her family physician, Dr. Schenk testified that he found
Mrs. D'Amico to be afflicted with a chronic rheumatic valvular

heart disease. Nevertheless and despite this heart condition, the decedent pursued her occupational duties in a capable manner and to the apparent satisfaction of her employer.

On June 5th, 1939, the decedent was in the plant of the respondent on the second floor of the building. She had just finished eating her lunch on the employer's premises, and was about to place some papers in a waste basket, and get a drink of water. She turned away from a fellow worker and apparently proceeded to descend a flight of stairs, also within the premises of the respondent, when suddenly screams and yells were heard from the decedent and she was next seen, shortly thereafter, lying prostrate at the bottom of the staircase. Fellow workers who immediately went to her aid found her in considerable pain, holding her head and moaning. Nor did she respond to any questions put by her co-workers.

An ambulance was called and she was taken to Muhlenberg Hospital, Plainfield, where a routine physical examination was made on admission. The hospital records indicate that her pulse rate was 94, regular, blood pressure 105/70, respiration 24 with a deep character, nutrition and other factors good. She appeared in a moderate amount of pain, didn't seem to be very co-operative, and was shaking from side to side and stated that she was unable to control or stop the shaking. External physical examination indicated that her right knee was slightly swollen and that the upper right abdominal reflex was absent. The patient complained of headaches and said that she was dizzy. The decedent was at the hospital until June 10th, 1939, when she was discharged and was returned to her home. Dr. Joseph Schenk visited her on that date and the decedent complained of multiple pains and aches of the body. These apparently were due to the extensive bruises suffered by her and were evidenced by black and blue areas over and above the right knee and the front of the right hip. He also found that her left eye was closed and that her head moved from side to side in a painful and sore manner. This doctor treated the decedent until about July 21st following which he did not see her again for several weeks until she was admitted to St. Peter's Hospital, New Brunswick, on August 1st. At that time the decedent

presented symptoms of an enlarged spleen, fever, with a history of chills, aching sensation of the entire body as well as symptoms of petechia. She was also found to be suffering from a general weakness of the muscles and joints of the body as a whole. Dr. Schenk made a tentative diagnosis of sub-acute bacterial endocarditis, before her admission to St. Peter's Hospital which was confirmed at that institution. He continued to treat the decedent from August 1st to September 16th at the hospital and thereafter to September 23d when she died of sub-acute bacterial endocarditis.

It was Dr. Schenk's opinion that between the date of the accident and August 1st (date of her admission to the second hospital) during which time he was treating the decedent for the injurious effects of the accident of June 10th, she was not in any condition to go to work. She was convalescing and at the best, all she was also to do were some light house duties. During this recuperative period, the decedent was confined to bed for about four or five weeks. It is significant that prior to her second hospital admission and particularly on July 1st, 1939, when Dr. Schenk had occasion to examine the decedent, he found that she exhibited a normal temperature and displayed no apparent symptoms of bacterial infection. Similarly on July 21st when he again examined her there were no symptoms of endocarditis. However, on August 1st there was presented the full picture of that condition.

There also testified on behalf of the petitioner Dr. Harold Pittis, Dr. Sidney Smith, Dr. Edna Thompson and Dr. Irving Applebaum. Dr. Smith, the resident physician at St. Peter's Hospital when the decedent was admitted there on August 1st, 1939, testified that he made a diagnosis of sub-acute bacterial endocarditis. This condition, in his opinion, was causally related to the accident and trauma of June 10th, 1939. He explained that the chronic rheumatic valvular heart disease of the decedent rendered that area of her body weakened and susceptible to infection. Following the accident, her physical resistance was lowered by the effects of the trauma to such an extent, that, coupled with the underlying weakened heart condition, the focus of infection, ever present in every person, sought out the vulnerable area, with the

resultant sub-acute bacterial endocarditis which permeated her blood stream and eventually caused her death. Dr. Applebaum, a specialist in diseases of the chest, heart and lungs, testified that it was his opinion that the decedent, suffering from a chronic heart disease of long standing, was subjected to a lower physical resistance due to the effects of the injuries caused by the accident. By reason of this lowered resistance, she was rendered more susceptible to and did contract a bacterial infection of the valves of her previously diseased heart. He pointed out that this decedent, not being a healthy woman at the time of the accident, had less physical reserve to ward off infection than a person with normal health. Thus the picture was presented, particularly during her period of convalescence from the moderately severe injury which she suffered, of a still lowered resistance which allowed the infectious process to set in and progress. He was also of the opinion that the decedent during the period of convalescence was weaker than she was before the accident and unable to ward off the ravages of the infection which rapidly progressed and resulted in her death on September 23d. Thus Dr. Applebaum found a causal relationship between the trauma of June 10th, the lowered resistance which ensued, and the sub-acute bacterial endocarditis which caused her death.

On behalf of the respondent there appeared Dr. Joseph Schenk, Dr. Jack Blumberg, Dr. Andrew C. Ruoff, Dr. John H. Rowland, Dr. Asher Yaguda and Dr. J. Allen Yager. The respondent's witnesses were of the opinion that there was no causal relationship between the trauma of June 10th, 1939, and her subsequent death of September 23d, 1939, denying that there was either a direct or indirect relationship between these two events. The theory of the petitioner's case as I view it, is not that the trauma directly caused the sub-acute bacterial endocarditis infection, but rather that the trauma of the accident and its painful sequela superimposed upon a person with a chronic heart disease, so lowered the resistance of the victim that she thereby fell easy prey to the infectious process that developed. On the other hand, the respondent's medical witnesses contend that the resistance of the decedent following the accident was no lower than it was prior to that

occurrence and went so far as to suggest that there was an improved or greater resistance after the fall. Therefore, they were of the opinion that the bacterial infection which caused her death was not related causally or otherwise to the accident.

I am thus called upon to resolve a sharp conflict of medical opinion. The applicable rule as enunciated by the adjudicated cases is that there be shown a "causal relationship" between the work or accident and the resulting disability or death in order that the accident be deemed compensable. *Ciecwirz* v. *Public Service Electric and Gas Co.,* 24 *Atl. Rep.* (*2d*) 394. The test of causal connection, as approved by Mr. Justice Swayze in *Newcomb* v. *Albertson,* 85 *N. J. L.* 435; 89 *Atl. Rep.* 928, is:

"It seems to me enough if it appears that the employment is one of the contributing causes without which the accident which actually happened would not have happened, and if the accident is one of the contributing causes without which the injury which actually followed would not have followed."

To the same effect are the rulings in *Tutino* v. *Ford Motor Co.,* 111 *N. J. L.* 435; 168 *Atl. Rep.* 749, and *Bollinger* v. *Wagaraw Building Supply Co.,* 122 *N. J. L.* 512; 6 *Atl. Rep.* (*2d*) 396.

From a careful consideration of all the testimony adduced, I am satisfied that the decedent suffered a fairly severe trauma when she was precipitated down the flight of stairs at her employer's premises. Witness the one uncontradicted testimony that she was found in considerable pain, moaning and evidently injured to such an extent that she was unable to speak and had to at once be removed to a hospital in an ambulance. Furthermore, the injuries disclosed on physical examination at the hospital and her confinement there for upwards of five days and subsequent confinement and treatment at home until her second admission to a hospital a short time later support such a conclusion. That this woman was in a weakened physical condition prior to the accident is more or less conceded and fairly inferable from the medical attendance she required during the years preceded by the accident. Nor does there appear to be any dispute that she was afflicted with a chronic valvular heart disease of long

standing. Viewing the uninterrupted sequence of events and the physical debility manifested by the decedent subsequent to the accident of June 10th, and up to the time of her death on September 23d, I am constrained to accept as a more logical and more reasonable hypothesis the medical theory advanced by the petitioner's witnesses.

It is to be borne in mind that reasonable probability and not ultimate medical certainty is the test to be applied in compensation cases. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; 170 *Atl. Rep.* 22; *Auten* v. *Johnston,* 115 *N. J. L.* 71; 178 *Atl. Rep.* 187. All that is required is that the claimed conclusion from the offered fact be a probable or a more probable hypothesis with reference to the possibility of other hypotheses. *Beylus* v. *Wilkinson Gaddis Co.,* 115 *N. J. L.* 43; 178 *Atl. Rep.* 181; *affirmed,* 116 *N. J. L.* 92; 182 *Atl. Rep.* 873; *Hercules Powder Co.* v. *Nieratko,* 113 *N. J. L.* 195; 173 *Atl. Rep.* 606; *affirmed,* 114 *N. J. L.* 254; 176 *Atl. Rep.* 198.

The testimony as a whole justifies the conclusion that this woman afflicted with an underlying heart condition which rendered her weak physically, suffered a further lowering of resistance as the result of the accidental injury in question. She was thus rendered more susceptible to bacterial infection which the evidence indicates developed in that vulnerable area of her body, the heart.

Accordingly, I find that from the testimony here presented that there was a causal relationship or a chain of causation between the accidental injuries suffered by the decedent on June 10th, the subsequent lowering of her physical resistance and the contraction by her of the infectious sub-acute bacterial endocarditis which caused her death on September 23d, 1939.

It is also my finding and conclusion that the accident arose out of and in the course of her employment. She having just concluded her lunch in the ambit of the place of her employment, a practice and custom of considerable standing evidently known to and acquiesced in by the employer. Accidental injuries suffered under such circumstances arise out of and in the course of the employment.

* * * * * * *

In accordance with the foregoing findings, judgment is hereby entered in favor of Frank D'Amico and against the respondent, Middlesex Dress Co. * * *

STEPHEN LORENZ,
*Deputy Commissioner.*